**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **JIMMIE DALE MILLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 3:17-CV-859-MAB** |
| | ) | |
| **JOHN BALDWIN,** | ) | |
| **JACQUELINE LASHBROOK,** | ) | |
| **KAREN JAIMET, LARUE LOVE,** | ) | |
| **CHRISTOPHER SCOTT THOMPSON,** | ) | |
| **RHONDA MCWILLIAMS,** | ) | |
| **ROSE LOOS, DEREK FLATT,** | ) | |
| **WEXFORD HEALTH SOURCES, INC.,** | ) | |
| **DR. LOUIS SHICKER,** | ) | |
| **DR. STEVE MEEKS, ANGEL RECTOR,** | ) | |
| **DR. ALBERTO BUTALID,** | ) | |
| **DR. N. WALLABHANENI,** | ) | |
| **CHRISTINE BROWN, and** | ) | |
| **DR. MICHAEL SCOTT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motions for summary judgment filed by all Defendants (Docs. 264, 285). For the reasons explained in this Order, the motions will be granted.

## BACKGROUND

Plaintiff Jimmie Dale Miller filed this action pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated at Pinckneyville Correctional Center. He is pursuing claims that a number of medical providers, grievance officials, and prison administrators were deliberately indifferent to his serious medical needs and took no action to address his concerns regarding his hepatitis C, diabetes, lost eyeglasses, mental health, and pain near his left kidney (Doc. 183; Doc.

282, 296).

Defendants Dr. Alberto Butalid, Rose Loos, Angel Rector, Dr. Michael Scott, Dr. Nageswararao Vallabhaneni, and Wexford Health Sources, Inc. (the "Wexford Defendants") filed their motion for summary judgment on December 23, 2019 (Doc. 264). Plaintiff filed his response in opposition on May 19, 2020 (Doc. 282). The Wexford Defendants filed a reply brief on June 2, 2020 (Doc. 290).

Defendants John Baldwin, Christine Brown, Derek Flatt, Karen Jaimet, Jacqueline Lashbrook, Larue Love, Rhonda McWilliams, Dr. Steve Meeks, Dr. Louis Shicker, and Christopher Scott Thompson (the "IDOC Defendants") filed their motion for summary judgment on May 26, 2020 (Docs. 285, 286, 287). Plaintiff filed his response in opposition on July 16, 2020 (Doc. 296). The IDOC Defendants filed a reply brief on July 23, 2020 (Doc. 299).

The materials submitted by the parties are voluminous and daunting—well over 100 pages of briefing and nearly 3,500 pages of exhibits addressing sixteen separate Defendants, not to mention the numerous secondary motions, responses, and replies (*see* Doc. 306). The Court's review of the parties' submissions is restricted to the portions of the record they cited, and the legal arguments they expressly articulated. The Court did not comb through the record to find facts to support vague allusions in the briefs.

## FACTS

Plaintiff Jimmie Dale Miller is an inmate in the Illinois Department of Corrections. He was incarcerated in June 2016 and assigned to Pinckneyville, where he arrived on September 1, 2016 (Doc. 265-1, p. 44; Doc. 265-2, pp. 14–15; Doc. 286-15, pp. 10, 11). He remained at Pinckneyville until February 2019, except for brief furloughs to other facilities (*see* Doc. 286-15, pp. 2–11). In February 2019, Plaintiff was transferred to Lawrence Correctional Center (*Id.* at p. 2). He was

released from prison in June 2020 (Doc. 296, p. 13). Prior to and during his incarceration, Plaintiff had a number of physical and mental health issues, including hepatitis C ("HCV"), type 2 diabetes, undiagnosed pain in his left side, and bipolar disorder.

## A.  HEPATITIS C

Hepatitis C is a virus that spreads through blood-to-blood contact and infects and inflames the liver.[1] While some people infected with the virus are able to naturally clear it from their bodies, most people develop chronic hepatitis C, which can lead to liver scarring (called fibrosis), cirrhosis (severe and permanent scarring), liver cancer, liver failure, and even death. HCV can be treated, and often cured, with antiviral medications. *Id.* (*see also* Doc. 282-1, pp. 12–13). Treatment, however, is complicated and recommendations are constantly evolving (*e.g.,* Doc. 282-1, pp. 35, 92; Doc. 286-2, p. 1).[2] Treatment can take between two to six months and is costly (tens of thousands of dollars per inmate) but has a success rate of over 90% (Doc. 282-1, pp. 13–14).[3]

The IDOC has partnered with the University of Illinois Chicago ("UIC") to treat HCV-positive inmates (Doc. 282-3, p. 2). Together they authored Guidelines for diagnosing, evaluating, monitoring, and treating inmates with HCV (Doc. 282-3; *see also* Doc. 282-1, pp. 34, 90–91). The Guidelines closely track the recommendations of national organizations, such as the American Association for the Study of Liver Disease and the Infectious Disease Society of America (Doc. 282-3, p. 2; Doc. 282-1, pp. 90–91). Wexford Health Sources, Inc., which is a private corporation

---

[1]  *Hepatitis C*, NAT'L INST. OF DIABETES AND DIGESTIVE AND KIDNEY DISEASE, https://www.niddk.nih.gov/health-information/liver-disease/viral-hepatitis/hepatitis-c (last visited November 27, 2020).

[2]  *See also* Monica K. Houston, *Hepatitis C: There's a Cure, But Who Will Bail Out the Department of Corrections?*, 11 HEALTH LAW AND POLICY BRIEF 27, 33–35 (2017), *available at* https://digitalcommons.wcl.american.edu/cgi/viewcontent.cgi?article=1145&context=hlp.

[3]  *See also* Houston, *supra* note 2, at pp. 33–35, 36–37.

the IDOC contracts with to provide medical care to inmates in IDOC facilities, is required to adhere to the IDOC's Guidelines (Doc. 282-1, p. 47). Wexford employs Dr. Dina Paul as the Chronic Disease and Case Management Director (*Id.* at p. 3). In this position, she evaluates three to four thousand patients with hepatitis C per year (*Id.*). She is an expert in managing and treating patients with HCV (*Id.* at pp. 19–20; *see also* Doc. 282-4, p. 79).

National guidelines recommend anti-viral treatment for all patients infected with HCV (Doc. 282-1, pp. 69–70). However, the national guidelines also recognize that due to the cost of the medication, in some situations, treatment should be prioritized for patients with more advanced liver disease (*Id.*). Prioritization is necessary for the IDOC given the high incidence of HCV in prisons and the cost of treatment (Doc. 282-1, pp. 81–82; *see also* Doc. 282-3, p. 2).[4] Priority goes to inmates with more advanced liver disease while other inmates are monitored and evaluated every six months at chronic care clinic visits and considered for HCV treatment as clinically indicated (Doc. 282-2; Doc. 282-3, p. 2). Dr. Dina Paul agreed that it was appropriate to monitor inmates whose condition was not advanced (Doc. 282-1, pp. 80–81).

The IDOC's Hepatitis C Guidelines adopted in May 2014 ("2014 Guidelines") dictated that inmates entering IDOC custody were screened for HCV at the receiving and classification facility (Doc. 282-3, p. 15). If the test was positive and the inmate wanted to be evaluated for possible treatment, lab tests were then performed to confirm that the inmate had chronic HCV and to determine the inmate's APRI score (Doc. 282-3, p. 15). The APRI is a non-invasive, convenient, and low-cost way to estimate fibrosis of the liver from routine blood tests (Doc. 282-1, pp. 50, 87–

---

[4] Dr. Dina Paul testified that up to 25 to 30% of inmates in the IDOC have HCV (Doc. 282-1, pp. 81–82). *See also* Houston, *supra* note 2, at p. 32.

88).[5] IDOC physicians also evaluated the inmate for "absolute exclusion criteria" that precluded the inmate from receiving treatment for HCV, which included amongst other things uncontrolled diabetes (Doc. 282-3, p. 15; Doc. 282-1, p. 70).

Under the 2014 Guidelines, if the inmate's APRI score was less than 0.5, they were not eligible for HCV treatment and they were followed in the chronic care clinic every six months (Doc. 282-3, pp. 10, 17).[6] If the inmate's APRI score was greater than 0.5 and they wished to be considered for HCV therapy, then they received an "initial work up," which included baseline blood work, a FibroSpect/Sure (a specialized blood test used for measuring fibrosis), Hepatitis A and B vaccinations, and Hepatitis C education and counseling (Doc. 282-3, pp. 10, 15–17; Doc. 282-1, pp. 36–37). And if the FibroSpect/Sure score was a Level 3 or 4, the patient was referred to UIC (Doc. 282-3, pp. 10, 15–17).

Dr. Dina Paul testified that Defendant Dr. Louis Shicker, the IDOC Medical Director, revised the HCV guidelines in early 2015, and those changes were discussed at a quarterly meeting in June 2015 (Doc. 282-1, pp. 37–38). One of the changes was the discontinuation of FibroSpect/Sure testing because "they didn't think it was very accurate" (*Id.* at 37–40; *see also* Doc. 282-3, pp. 9, 12–13). According to Dr. Paul, by the time Plaintiff was incarcerated at Pinckneyville in September 2016, the FibroSpect/Sure testing had been replaced by a liver/spleen

---

[5] APRI stands for AST to Platelet Ratio Index. It is based on the ratio of AST (which stands for aspartate aminotransferase, an enzyme found primarily in the liver) to platelets in the patient's body (Doc. 282-1, p. 56; Doc. 282-4, pp. 21–22). High levels of AST and low platelet counts are indicative of liver damage. *What is the APRI Score?*, WebMD, https://www.webmd.com/hepatitis/what-is-apri-score (last visited November 27, 2020). The APRI score will get higher if the individual's AST level increases or their platelet count decreases (Doc. 282-1, p. 56). The APRI has good accuracy at predicting fibrosis at the two ends of the spectrum (*Id.* at pp. 49–50). In other words, a low APRI score (less than 0.5), is a strong indicator that there is *no* significant fibrosis or cirrhosis while a high APRI score (over 1.5) is a strong indicator that there *is* significant fibrosis or cirrhosis. *What is the APRI Score?*, WebMD. The mid-range values are not as accurate at predicting the amount of fibrosis (Doc. 282-1, pp. 50, 97–98).

[6] Dr. Paul testified that she thought the threshold APRI score was something over 1.0 (Doc. 282-1, p. 85).

ultrasound that was conducted if the APRI score was over 1.0 and the platelet count was under 200,000 (Doc. 282-1, pp. 40–42). Dr. Dina Paul testified that this policy was reasonable (*Id.*). Dr. Paul testified that she was unsure whether the Guidelines—as in, the actual printed document—were formally revised to reflect these changes (*Id.* at pp. 38–39). Plaintiff indicated that he was not provided with a written version of the Guidelines as amended in 2015 (Doc. 282, p. 4 n.1).

The Guidelines were revised again in December 2017, and provided that inmates with an APRI score over 1.0 (or between 0.7 and 1.0 with low platelet count, low albumin, or elevated INR) were supposed to get a FibroScan (Doc. 282-3, p. 2). A FibroScan is a specialized ultrasound of the liver that assesses how stiff or how flexible it is as a way to estimate the amount of fibrosis (Doc. 282-1, pp. 33–34, 48, 88). The Guidelines were revised again in October 2018 to provide that any inmate with HCV was supposed to get a Fibroscan, regardless of their APRI score, unless they met one of the absolute exclusion criteria (*Id.* at pp. 35–36). The guidelines were revised again in January 2019 (*see* Doc. 282-1, pp. 35, 53).

Plaintiff was diagnosed with hepatitis C in approximately 2014 (Doc. 265-1, p. 63; Doc. 283-2, p. 1). Plaintiff was subsequently incarcerated and transferred to Pinckneyville in September 2016 (Doc. 265-1, p. 44; Doc. 265-2, pp. 14–15). During his intake screening, Plaintiff informed the nurse that he had HCV, and he was enrolled in the HCV chronic care clinic (Doc. 265-2, pp. 15, 16). Nurse Practitioner Angel Rector saw Plaintiff for the first and only time on September 21, 2016 at his first chronic care clinic (Doc. 265-2, pp. 99–101; Doc. 265-8).[7] Plaintiff's APRI score was calculated as 0.71 (Doc. 265-2, pp. 99–101; Doc. 265-8). NP Rector testified via affidavit, and the medical records indicate, that she spoke with Plaintiff about his hepatitis C status, including

---

[7] Angel Rector was employed by Wexford as a Nurse Practitioner at Pinckneyville from January 2007 until January 2017 (Doc. 265-8).

discussing whether he would comply with treatment if he became eligible and whether he had any unstable psychiatric issues (Doc. 265-2, p. 101; Doc. 265-8). Nurse Rector determined that "based on the IDOC chronic clinic guideline, my assessment based on my education and experience, [Plaintiff's] presentation, and [Plaintiff's] APRI score," Plaintiff did not qualify for HCV treatment (Doc. 265-8). She continued him in the HCV chronic clinic to monitor his condition (Doc. 265-8; *see also* Doc. 265-2, p. 100).

According to Plaintiff, however, he was never told that the visit pertained to his HCV (Doc. 265-1, pp. 111–12, 115). He testified that he nevertheless told NP Rector about his HCV and asked for the hepatitis A and B vaccinations. NP Rector told him that he needed to "drop a request slip."

On November 29, 2016, Plaintiff saw Dr. Michael Scott for the first time (Doc. 265-2, p. 32). Dr. Scott was the Medical Director at Pinckneyville at that time (Doc. 282-4, pp. 10–13, 26).[8] Plaintiff complained of ongoing, intermittent pain in his left lower side near his kidneys (Doc. 265-2, p. 32; Doc. 282-4, pp. 37–38, 72–73).[9] Dr. Scott ordered a chest x-ray and multiple laboratory tests to try to diagnose the source of the pain. There is nothing in the medical record that indicates Plaintiff complained about his HCV at the November 29th appointment with Dr. Scott. Plaintiff testified, however, that he took two binders containing his medical records to this appointment, and he complained to Dr. Scott not only about his left flank pain, but also about his HCV, amongst other things (Doc. 265-1, pp. 58–59, 128–132). He claims Dr. Scott refused to review his medical records and refused to listen to his complaints about problems other than his left flank pain and simply "brushed [them] aside."

---

[8] Dr. Michael Scott was employed by Wexford as the Medical Director at Pinckneyville from January 2016 through February 2017 (Doc. 282-4, p. 10). Prior to working at Pinckneyville, Dr. Scott practiced emergency medicine for the better part of 30 years (*Id.* at pp. 10–13, 26).

[9] Further details about this visit are provided in the next section regarding Plaintiff's diabetes and flank pain.

Plaintiff had additional appointments with Dr. Scott on January 11 and 23, 2017 to follow up on the tests results and his diabetes (Doc. 265-2, pp. 36, 38; Doc. 282-4, pp. 56–59, 74–76).[10] There is no indication in the medical records that Plaintiff's HCV was discussed. According to Plaintiff, however, he requested treatment for Hepatitis C and vaccinations for Hepatitis A and B from Dr. Scott at the January 23rd appointment, but Dr. Scott refused to provide any treatment or order the "initial work up" outlined in the Guidelines (Doc. 265-1, pp. 131, 141).

Plaintiff's final visit with Dr. Scott was on January 31st for his first, baseline chronic clinic visit for diabetes (Doc. 265-2, pp. 105–106; Doc. 282-4, pp. 59–61).[11] There is no indication in the medical records that Plaintiff's HCV was discussed. Dr. Scott did not ever recommend that Plaintiff receive the hepatitis A and B vaccines, nor did he administer them to Plaintiff (Doc. 282-4, pp. 41–42). He testified that he was "unaware of any recommendations" for HCV patients to receive hepatitis A and B vaccines.

Plaintiff had chronic clinic visits on April 30, 2017 with Defendant Dr. Alberto Butalid (Doc. 265-2, pp. 107–110; Doc. 265-14).[12] Plaintiff's APRI score was calculated as 0.8. Plaintiff did not report any symptoms or complications with his HCV, and on examination he was not jaundiced, he had no swelling, and he had no palpable liver enlargement. Dr. Butalid marked that Plaintiff's HCV was being controlled and was stable. Dr. Butalid testified that Plaintiff was not referred for any further testing or possible treatment because his APRI score was below the

---

[10] Further details about the test results and these visits are provided in the next section regarding Plaintiff's diabetes and flank pain.

[11] Further details about this visit are provided in the next section regarding Plaintiff's diabetes and flank pain.

[12] Dr. Alberto Butalid has been employed by Wexford since 2011 (Doc. 265-14). He was assigned as a traveling physician to Pinckneyville from approximately April 2017 until July 19, 2018, when he was transferred to Vandalia Correctional Center (*Id.*).

threshold number for doing so.

Plaintiff had chronic clinic visits on August 26, 2017 with a non-Defendant medical provider (Doc. 265-2, pp. 113–116; Doc. 265-14). His APRI score was 0.517. The provider marked that Plaintiff's HCV was being controlled and was stable and Plaintiff was not a candidate for treatment. The provider ordered Plaintiff to return to the HCV clinic in six months. Plaintiff had chronic clinic visits for diabetes and hypertension on December 9, 2017 with a non-defendant medical provider (Doc. 265-2, pp. 119–120).[13] It does not appear that he was seen for his HCV at that time (*see id.*).

Dr. Butalid saw Plaintiff for follow-up appointments regarding his diabetes on December 17, 2017 and January 7, 2018 (Doc. 265-2, pp. 71, 76; Doc. 265-14). There is no indication in the medical records that Plaintiff's HCV was discussed at these appointments (*see* Doc. 265-2, pp. 71, 76). The January 7th appointment was the last time Dr. Butalid saw Plaintiff (Doc. 265-14).

On August 23, 2018, Plaintiff was seen at the HCV chronic care clinic and his APRI was calculated as 0.4 (Doc. 265-6, pp. 122, 210–11). In December 2018, his APRI was calculated as 0.3 (*Id.* at pp. 126, 212–13). Both times, the practitioner indicated that Plaintiff was not a candidate for treatment (*Id.* at pp. 122, 126). Dr. Dina Paul opined that during the time Plaintiff was at Pinckneyville, his HCV "was treated as per the IDOC Office of Health Services' Hepatitis C Guidelines. (Doc. 282-1, pp. 22–23).

Plaintiff was transferred to Lawrence in February 2019. After that, his HCV chronic care clinic visits were with Dr. Paul herself (Doc. 282-1, pp. 31–35). His first visit with Dr. Paul was on August 22, 2019 (Doc. 265-6, p. 132). His APRI score was calculated as 0.4 and his albumin,

---

[13] Further details about this visit is provided in the next section.

platelets, and INR (which are the labs looked at to assess liver function) were all within normal range (Doc. 265-6, pp. 132, 222–23; Doc. 282-1, p. 45). Dr. Paul ordered lab work to check whether Plaintiff was immune to hepatitis A and B; if he was not immune, he agreed to being vaccinated (Doc. 265-6, p. 132; Doc. 282-1, pp. 98–99). She also referred him for a Fibroscan in accordance with the January 2019 version of the IDOC Guidelines, which were in effect at that time (Doc. 265-6, p. 132.; *see* Doc. 282-1, p. 35). Based on the results of the Fibroscan, Plaintiff was given a METAVIR fibrosis score of F3, which meant he had "significant liver fibrosis" (Doc. 282-1, pp. 44, 63–64). However, Dr. Paul further indicated that his lab work "hasn't budged at all" and showed that Plaintiff's liver was "functioning normally" the entire time he was at Pinckneyville and up through the time she saw him (*Id.* at pp. 44–45).

Dr. Paul saw Plaintiff again in December 2019 (Doc. 282-1, pp. 72–76). She informed him that under the IDOC's Guidelines, he was not eligible for HCV treatment because his diabetes was uncontrolled. She also informed him that his lab work showed he was immune to hepatitis A but not B, and he had never contracted hepatitis B (*Id.* at pp. 73, 99; *see also* Doc. 265-6, p. 224). She ordered the hepatitis B vaccine series (Doc. 282-1, p. 99). She also ordered a liver-spleen ultrasound in order to get imaging of Plaintiff's spleen (*Id.* at p. 75–76). She explained that an enlarged spleen is "a very sensitive marker of advanced liver disease. . . . But when the spleen is within normal limits as to its size, it's reassuring that the liver scarring is not advanced" (*Id.*). She testified that Plaintiff's spleen was normal in size (*Id.*).

## B.  DIABETES, DIET, AND LEFT FLANK PAIN

Plaintiff was diagnosed with type II diabetes around February 2013 (Doc. 265-1, p. 42). He was on medication to control his diabetes, however, it was discontinued in June 2016 when he entered the IDOC (Doc. 265-2, p. 36; Doc. 282-4, p. 56). Labs drawn at that time show his

hemoglobin A1C was 5.8% and within normal limits (Doc. 265-3, p. 84).[14]

In September 2016—the month that Plaintiff was transferred to Pinckneyville—he spent over $100 on food and drinks at the commissary, including corn chips, potato chips, popcorn, Lemonheads, Jolly Ranchers, Snickers, Pop Tarts, Little Debbie Honey Buns, chocolate chip cookies, "tubs" of cheese, sausage sticks, pepperoni, salami, Sweet Sue ham, refried beans, rice, tortillas, 48 packages of ramen noodles, Gatorade, and 16 packets of Berry Blue Typhoon drink mix (Doc. 265-9, pp. 15–16). In October 2016, he again spent over $100 on food and drinks at the commissary, including many of the same chips, candy, cookies, cakes, meats, beans, rice, and drinks (*Id.* at pp. 16–17). During the month of November 2016, Plaintiff was in segregation and was not allowed to buy any food at the commissary (*Id.* at pp. 17–18; *see* Doc. 283-1, p. 53).

On November 23, 2016, Plaintiff reported to nurse sick call about pain in his left side that he claimed had been ongoing for a "long time" (Doc. 265-2, p. 31; *see also* Doc. 265-1, pp. 126–27). He rated his pain as a two out of ten but denied was not presently experiencing any discomfort. The nurse offered him Tylenol, but he declined. The nurse referred him to the physician. Plaintiff then saw Dr. Michael Scott six days later on November 29th (Doc. 265-2, p. 32; Doc. 282-4, pp. 37–39, 72–73). Plaintiff testified at his deposition that he had been experiencing the pain in the area of his left kidney since probably 2012 (Doc. 265-1, p. 101). However, the medical records indicate that he told Dr. Scott he had been having intermittent pain in his left lower side near his kidneys for five or six months (Doc. 265-2, p. 32; *see also id.* at p. 35; Doc. 282-4, pp. 37–39, 72–73). Plaintiff claimed it was an aching discomfort that got worse "with recumbency and at night."

---

[14]   Hemoglobin A1C, also referred to as just A1C or HbA1c, is a blood test that measures the average blood glucose (sugar) level over the past three months. *Understanding A1C*, AM. DIABETES ASSC., https://www.diabetes.org/a1c (last visited Nov. 27, 2020). A simple glucose test only measures the amount of sugar in your blood at the very moment it is drawn. *Id.* Consequently, the A1C test is helpful for diagnosing prediabetes and diabetes, and is critical for monitoring how well the diabetes treatment plan is working over time. *Id.*

Plaintiff indicated that he was not presently experiencing any pain. He denied previous trauma, shortness of breath, cough, urinary symptoms, blood in his urine, fever and chills. Dr. Scott testified that the location Plaintiff identified was tender but did not seem to involve his kidney; rather, it seemed to involve a musculoskeletal source. Dr. Scott ordered a chest x-ray to check for pulmonary disease and multiple laboratory tests, including a urinalysis and other bloodwork, to check for urinary issues, kidney issues, and Plaintiff's glycemic control.

The chest x-ray came back normal (Doc. 265-3, p. 78; Doc. 282-4, pp. 38–39). The labs did not show any urinary or kidney issues (Doc. 282-4, pp. 72–73). But they did show Plaintiff's A1C and glucose were both elevated (Doc. 265-3, p. 88). His glucose was 298 mg/dl (normal is 65–110) and his A1C was 9.4% (normal ranges from 4.0–6.0%). Dr. Scott testified that an A1C level of 9.4% suggests that the patient's diabetes "has not been well controlled in the prior three months" (Doc. 282-4, p. 40).

During the month of December, Plaintiff spent over $250 on food and drinks at the commissary, including corn chips, tortilla chips, "caramel delights," Twix, Pay Day, M&Ms, Snickers, Pop Tarts, "cinnamon square cereal," iced oatmeal cookies, caramel cookies, Little Debbie Honey Buns, refried beans, rice, 47 packages of ramen noodles, pepperoni, salami, beef and cheese sticks, a twelve pack of Gatorade, a twelve pack of Sprite drinks, and sixteen packets of Berry Limeade Blast drink mix (Doc. 265-9, pp. 18–20).

Plaintiff saw Dr. Scott at a follow-up appointment on January 11, 2017 (Doc. 265-1, p. 135–138; Doc. 265-2, p. 36; Doc. 282-4, pp. 56–59, 74–75). Dr. Scott informed Plaintiff that the previous testing and laboratory work did not show any abnormalities related to his kidneys. Plaintiff reported increased hunger, thirst, and urination. Dr. Scott noted that Plaintiff's diabetes medication, metformin, had been discontinued when he came into IDOC custody and he had been

off his medication for six months. Dr. Scott restarted Plaintiff on metformin and also prescribed glipizide. Dr. Scott also enrolled Plaintiff in the diabetes chronic clinic. Inmates in the diabetes chronic clinic see a practitioner every four months for monitoring (Doc. 282-2, p. 3). There is no indication that Plaintiff complained about left side pain at this appointment, and Dr. Scott did not order any further testing or treatment in relation to the pain (*see* Doc. 265-2, p. 36; Doc. 282-4, p. 55). The medical records reflect that the day after this appointment, at the request of Dr. Scott, a nurse delivered "education sheets" regarding diabetes to Plaintiff (Doc. 265-2, p. 37).

Plaintiff saw Dr. Scott again on January 23rd on a referral from a nurse practitioner for reevaluation due to an increase in his A1C (Doc. 265-2, p. 38; Doc. 282-4, pp. 57–58, 75–76). Dr. Scott adjusted Plaintiff's medication and ordered repeat A1C testing in three months. The medical records reflect that Dr. Scott instructed Plaintiff to increase his fluid intake and eat a well-balanced diet. Dr. Scott testified that he would have discussed with Plaintiff what a "well-balanced diet" entailed, which likely included "encourage[ing] him to minimize commissary purchases and food intake and stick with what was provided in the cafeteria since that was food that was designed to be healthy and containing the right caloric balance" (Doc. 282-4, p. 76). There is no indication that Plaintiff complained about left side pain at this appointment, and Dr. Scott did not order any further testing or treatment in relation to the pain (*see* Doc. 265-2, p. 38).

Dr. Scott then saw Plaintiff for the last time on January 31st for his first, baseline chronic clinic visit for diabetes (Doc. 265-2, pp. 105–106; Doc. 282-4, pp. 59–61). The medical record from that visit indicates that Plaintiff's A1C was elevated at 9.4%. Dr. Scott continued Plaintiff's medications and ordered Accu-checks of Plaintiff's blood sugar twice a month. He marked that Plaintiff should eat a "regular diet," which he testified meant "the food that was offered in the cafeteria" and "did not include junk food or commissary items" (Doc. 282-4, pp. 59–61). There is

no indication that Plaintiff complained about left side pain at this appointment, and Dr. Scott did not order any further testing or treatment in relation to the pain (*see* Doc. 265-2, p. 38).

During the month of January 2017, Plaintiff spent over $100 at the commissary on food and drinks (Doc. 265-9, pp. 20–21). In February, he spent over $200 (*Id.* at pp. 21–23). In March, he spent over $700 (*Id.* at pp. 23–27). And in April he spent over $400 (*Id.* at pp. 27–30).

On April 30, 2017, Plaintiff saw Defendant Dr. Alberto Butalid at a chronic clinic visit (Doc. 265-2, pp. 107–110; Doc. 265-14). Labs drawn prior to the visit showed that his glucose was measured at 367 mg/dl (normal is 65–110) and his A1C was measured at 16.5% (normal is 4.0–6.0%) (Doc. 265-3, p. 89). Dr. Butalid increased Plaintiff's glipizide, continued his metformin, and ordered Accu-checks of Plaintiff's blood sugar three times a week for two weeks (Doc. 265-2, p. 107; Doc. 265-14). Dr. Butalid also discussed with Plaintiff the importance of an appropriate diet, weight loss, and exercise, in addition to medication compliance.

During the months of May and June 2017, Plaintiff was in segregation and was not allowed to buy any food at the commissary (Doc. 265-9, p. 31; *see* Doc. 283-1, p. 64; Doc. 286-15, p. 7). In early July, he spent approximately $25 on food at the commissary, including tortilla chips, jalapeno popcorn, Pop Tarts, iced oatmeal cookies, and 24 packages of ramen noodles (Doc. 265-9, p. 31). By July 20th and through the month of August, Plaintiff was once again in segregation and was not allowed to buy any food at the commissary (*Id.* at p. 32; *see* Doc. 283-1, p. 98; Doc. 286-15, p. 6).

On August 26, 2017, Plaintiff was seen for his chronic clinic visits by a non-Defendant practitioner (Doc. 265-2, pp. 113–15; Doc. 265-14). Labs drawn prior to the visit showed that his A1C had dropped to 8.8% (normal is 4.0–6.0%) (Doc. 265-3, p. 92).

Plaintiff did not purchase any food at the commissary in September, October, or November

(Doc. 265-9, pp. 32–33). Despite this, when his labs were drawn on November 1st, his A1C was 17.6% (normal is 4.0–6.0%) (Doc. 265-3, p. 94). On December 1st, his A1C was retested and measured 18.0% (*Id.* at p. 95). His glucose measured 525 (normal is 65–110) (*Id.*). On December 9th, Plaintiff was seen for his chronic clinic visits by a non-Defendant physician (Doc. 265-2, pp. 65–66, 119–120; Doc. 265-14). The physicians ordered Plaintiff to be kept in the infirmary for approximately 24 hours for observation and monitoring because he was hyperglycemic, and he was given injections of insulin to bring his glucose down (Doc. 265-2, pp. 65–69). The physician also referred Plaintiff for a psychiatry consultation "ASAP," noting that a side effect of Abilify (the psychiatric medication Plaintiff was recently started on, (*see* Doc. 283-1, pp. 79–85, 95–97, 119–35)), is hyperglycemia and therefore this episode *may* have been caused by the Abilify.

Plaintiff saw Dr. Butalid on December 17th (Doc. 265-2, p. 71; Doc. 265-14). He complained of increased urination, dry lips and mouth, and increased thirst. Dr. Butalid discontinued the glipizide medication, continued the metformin, and increased Plaintiff's insulin. Dr. Butalid ordered a follow up appointment in three weeks, which took place on January 7, 2018 (Doc. 265-2, pp. 75, 76, 121; Doc. 265-14). Dr. Butalid performed a physical examination and found nothing abnormal. He adjusted the amount of insulin Plaintiff would receive in the evenings and also ordered a low sugar insulin snack. All diabetic inmates on insulin received an evening snack to help prevent hypoglycemia (the blood sugar dropping too low) during the night. (Doc. 265-14, p. 3; Doc. 282-4, p. 49). The January 7th appointment was the last time Dr. Butalid saw Plaintiff (Doc. 265-14). Medical records show that Plaintiff's A1C remained extremely elevated and his diabetes remained uncontrolled throughout 2018 while he was at Pinckneyville and throughout 2019 after his transfer to Lawrence (Doc. 265-6, pp. 204–24).

Dr. Scott testified that while he was at Pinckneyville, there was no special diet offered for

diabetic inmates and he had never ordered one (Doc. 282-4, pp. 46–49, 58). Both Dr. Scott and Dr. Butalid testified that the menu and dietary offerings were chosen (or at least reviewed) by a registered dietician in order to ensure the food offered was healthy and appropriate for everyone, including diabetics (Doc. 265-14; Doc. 282-4, pp. 49, 62, 65, 80; *see also* Doc. 265-15). Healthcare Unit Administrator Christine Brown also told Plaintiff that the meals offered at Pinckneyville were approved by a dietician and "[d]iabetics eat what other offenders eat" (Doc. 265-3, p. 102; *see also id.* at p. 119). Both Dr. Scott and Dr. Butalid testified that there were inmates who were able to control their diabetes through the diet provided by Pinckneyville (Doc. 265-14; Doc. 282-4, pp. 80–81).

For his part, Plaintiff contends that "during his time" at Pinckneyville, the IDOC implemented a "Therapeutic Diet Manual" (Doc. 282, pp. 8–9; Doc. 282-6). Plaintiff did not, however, offer any testimony or other evidence as to the specific date that it was written, implemented, or issued to practitioners (*see* Doc. 282), and there is no indication on the manual itself (*see* Doc. 282-6). The 129-page manual was shown to Dr. Scott during his deposition, and he testified that he had never seen it, did not know what a therapeutic diet was, and had never ordered a special diet for a diabetic inmate (Doc. 282-4, pp. 47–49).

## C. VISION ISSUES

Plaintiff testified that his glasses fell off during a fight with his cellmate on October 31, 2016 (Doc. 265-1, pp. 200–02). He said that he was examined by a nurse after the altercation, and she told him that she would get his glasses from his cell, but she never did. He was sent to segregation without his glasses. When he was released from segregation on November 30, 2016, his glasses were not in his property box. He ended up going approximately one year without his glasses (Doc. 265-2, pp. 81–85).

### D.  Mental Health

Plaintiff has a long history of mental health issues dating back to his teenage years (*see, e.g.,* Doc. 262-3, pp. 123–29; Doc. 283-1, pp. 22–24). When he entered the IDOC in June 2016, he reported that he was taking Risperdal (generic name risperidone) and Depakote to treat his mental health issues (Doc. 262-3, p. 127; Doc. 283-1, p. 5). The IDOC psychiatrist screened Plaintiff and diagnosed him with unspecified bipolar disorder with psychotic features, and he was continued on Risperdal (Doc. 283-1, pp. 1–9).[15]

On September 19, 2016, approximately three weeks after Plaintiff arrived at Pinckneyville, he met with Defendant Dr. Nageswararao Vallabhaneni for the first and only time (Doc. 283-1, pp. 38–42; Doc. 265-11).[16] The doctor assessed Plaintiff's mental health status and determined that he was "mentally stable" and no longer needed anti-psychotic medication. Plaintiff testified that Dr. Vallabhaneni also told him that the medication could harm him because he had HCV (Doc. 265-1, p. 159). "After proper education" by Dr. Vallabhaneni, Plaintiff consented to discontinuation of his Risperdal (Doc. 283-1, pp. 38–42; Doc. 262-11; *see also* Doc. 265-1, p. 160). Dr. Vallabhaneni ordered Plaintiff to return in four weeks for reassessment. He also instructed Plaintiff to contact him if Plaintiff need to be seen sooner. It is undisputed that Plaintiff never reached back out to Dr. Vallabhaneni before the doctor left Wexford in November 2016 (Doc. 282, p. 26).

---

[15] Plaintiff testified that when he entered the IDOC, the psychiatrist discontinued his prescription for Depakote because he was positive for HCV (Doc. 265-1, pp. 79–80). Depakote is known to cause liver damage and people with liver problems are advised not to take it. *Depakote Frequently Asked Questions*, https://www.depakote.com/faqs (last visited Nov. 27, 2020).

[16] Dr. Nageswararao Vallabhaneni is a psychiatrist who was employed by Wexford (Doc. 265-11). He was primarily assigned to Menard Correctional Center and was only assigned to Pinckneyville for a couple months from approximately August 2016 to approximately late October/early November 2016 (*Id.*). In November 2016, Dr. Vallabhaneni permanently retired from his employment with Wexford (*Id.*).

Plaintiff saw Rose Loos, a Qualified Mental Health Provider ("QMHP"), for a one-on-one therapy session one week after his appointment with Dr. Vallabhaneni, on September 26th   (Doc. 265-12; Doc. 283-1, pp. 43–48).[17] The records from that appointment indicate that Plaintiff's appearance was appropriate, he was oriented and cooperative, his thought process was clear and coherent, and his affect was unremarkable (Doc. 283-1, p. 43). Ms. Loos suggested a treatment plan involving one-on-one therapy and group therapy over the next twelve months. Plaintiff agreed with the plan (*Id.* at p. 48).

Plaintiff had a follow-up appointment on October 20th with a non-Defendant QMHP, Ms. Mason (Doc. 283-1, pp. 49–52). He told Ms. Mason that his Risperdal had been discontinued in September and stated that he "doesn't want psych meds any longer." He reported that his mood was "good." But eleven days later, on October 31st, Plaintiff got in a fight with his cellmate and was sent to segregation (Doc. 283-1, p. 53). During his deposition, Plaintiff testified, "I think I wrote [Rose Loos] a letter" prior to the altercation about the difficulties he was having with his cellmate and his desire "to do something before I bug out," but Loos never responded (Doc. 265-1, p. 161). Plaintiff did not offer any details about the purported letter, such as the date he wrote it, how he sent it to her, etc. (*see id.*). Plaintiff also admitted that he did not know whether Ms. Loos received the letter. He nevertheless maintained that he told her during one of their "sessions" prior to the altercation that "I wanted to get back on my medication, because I feel like I'm about to lose it. I made that clear to her." (*Id.* at pp. 162–63). There is no indication in the mental health records, however, of a conversation of this nature (*see* Doc. 283-1).

---

[17] Rose Loos is a licensed mental health professional and she has been employed by Wexford as a Qualified Mental Health Provider ("QMHP") at Pinckneyville since September 28, 2014 (Doc. 265-12). She provides supportive therapy to inmates in on-one-one and group settings (*Id.*). She is not a medical provider and cannot evaluate medical conditions or prescribe medication (*Id.*).

There is also no indication in the mental health records that Plaintiff ever mentioned resuming his medication the entire time he was in segregation. A QMHP checked in with Plaintiff on November 1st, the day after the altercation, and every week after that until he was released from segregation on November 30th (Doc. 283-1, pp. 53–55). The first week, Plaintiff had "no issues to report." The second week, Plaintiff stated "I'm okay." The third week, Plaintiff asked to see "Ms. Rose [Loos]" and he was referred to mental health services. The fourth and fifth weeks, Plaintiff had "no issues to report."

Following his release from segregation, Plaintiff had an appointment with Rose Loos on December 8th (Doc. 283-1, pp. 56–57; Doc. 265-12). Ms. Loos documented that Plaintiff's appearance was appropriate, he was oriented, and his affect was unremarkable, but his thought process was tangential and his mood was irritable. Plaintiff reported that he "snapped" on his cellmate and was put in segregation after they got in a fight. Ms. Loos wrote that he felt "he needs to be placed back on his medications." This is the first indication in the mental health records that Plaintiff wanted to resume his medication (*see* Doc. 283-1). Ms. Loos referred him to the psychiatrist.

Plaintiff had a follow-up appointment with Ms. Loos on January 10, 2017 (Doc. 283-1, pp. 58–59; Doc. 265-12). Plaintiff had not yet seen the psychiatrist (*see* Doc. 283-1). Ms. Loos documented that Plaintiff's appearance was appropriate, he was oriented, his affect was unremarkable, but his mood was irritable (*Id.* at pp. 58–59). Plaintiff reported that he was sick and "[did] not feel good at all." He said everything he ate or smelled made him sick to his stomach, and he was not sure if it was his diabetes or HCV that was causing the problem. Ms. Loos provided supportive therapy and discussed coping skills with Plaintiff.

Plaintiff was not seen again until April 19th (Doc. 283-1, pp. 60–61). He told Ms. Loos

that he was doing the best he could to stay out of trouble. Ms. Loos documented that Plaintiff's appearance was appropriate, he was oriented, cooperative, and lucid, his affect was unremarkable, his thought process was clear and relevant, and his speech was normal. She provided supportive therapy and discussed coping skills with Plaintiff.

On May 2, 2017, Plaintiff was sent back to segregation for two months (*see* Doc. 283-1, p. 64). A QMHP checked in on him on May 9th, and he indicated that he "need[ed] to see psych and MHP," and he was referred to mental health services. Plaintiff saw Ms. Mason on May 13th (*Id.* at pp. 62–63). Plaintiff reported that he had been having a hard time managing his mood and had gotten into several fights and altercations. He said that he was previously seeking help and "they said they would help me" but "no one ever seemed to follow thru with anything." He stated that he thought he might need to go back on psychiatric medication. Ms. Mason referred Plaintiff to the psychiatrist.

Plaintiff reported that he was "okay" on May 16th, May 23rd, and May 30th (Doc. 283-1, pp. 64–66). On June 6th, he told the QMHP that he needed to see the psychiatrist and he was referred to mental health services (*Id.* at p. 77). On June 13th, he told Rose Loos he wanted "to see doctor," but she indicated that no action was required, and she did not make any referral (*Id.*). Two days later Plaintiff had a one-on-one appointment with a QMHP (Doc. 283-1, pp. 67–72). It was noted that his appearance was appropriate, he was oriented and cooperative, his thought process was clear and coherent, and his affect was unremarkable. The QMHP recommended monthly individual therapy sessions. The treatment plan did not include any psychiatric medication. Plaintiff agreed with the plan.

A QMHP checked in with Plaintiff on June 20th and referred him to mental health services after he said he had been waiting to see the psychiatrist (Doc. 283-1, p. 78). A QMHP checked in

with him again on June 28th, and Plaintiff reported, in pertinent part, that he still had not seen the psychiatrist and he needed to (*Id.* at pp. 75–76). On July 13, 2017—over seven months after he first requested to see and was referred to the psychiatrist—Plaintiff finally had an appointment with the psychiatrist (*Id.* at pp. 79–85). The doctor indicated that Plaintiff was appropriately groomed, alert, oriented, cooperative, and his thought process was clear/coherent, but he displayed mild psychomotor agitation, his attention was distractible, his speech was pressured (*Id.*). The doctor noted that Plaintiff had been off psychiatric medication for about nine months and "has become symptomatic with mildly pressured speech, irritability, insomnia, and psychomotor agitation" (*Id.*). He started Plaintiff on 2mg of Abilify and ordered a follow-up in two weeks (*Id.*; *see also* Doc. 262-3, p. 69).

At a follow-up appointment with the psychiatrist on August 7th, Plaintiff's Abilify was increased to 5mg (Doc. 283-1, pp. 95–97, 103–08; Doc. 262-3, p. 71). He continued taking Abilify until January 18, 2018, when it was discontinued due his history of diabetes (Doc. 283-1, p. 119–135, 145–150). He was then started on Haldol and Remeron (*Id.*).

## E.  FACTS RE: GRIEVANCES AND LETTERS REGARDING MEDICAL CARE

### 1.  John Baldwin

John Baldwin was the Acting Director of the IDOC from August 2015 until May 23, 2019 (Doc. 286-1). Plaintiff claims his friend**,** Tanya Nguyen, sent a letter to Director Baldwin, amongst others, on January 20, 2017 regarding the inadequate medical care he was receiving for his diabetes, HCV, and vision issues (Doc. 296, p. 4; Doc. 1-2, pg. 29) Plaintiff has no evidence that Director Baldwin ever received the letter, and he testified that he never got a response from Baldwin (*see* Doc. 265-1, pp. 196–98, 209–10; Doc. 296, p. 4). For his part, Baldwin testified that he has no personal recollection or record of receiving these letters or any other complaint from

Plaintiff regarding his medical treatment (Doc. 286-1; *see also* Doc. 225). He further testified that, as Director, he was not involved in the day-to-day operations at Pinckneyville, including the medical treatment of particular inmates (*Id.*).

On August 1, 2017, Plaintiff wrote a letter regarding inadequate medical treatment for his HCV, diabetes, vision issues, and the pain he had in his left kidney area (Doc. 1-1, pp. 71-82). The letter was addressed to a number of individuals and entities, including Baldwin (*Id.*). Plaintiff testified that he received mail receipts demonstrating that the recipients received the letter, but he misplaced them (Doc. 296, p. 14; Doc. 265-1, p. 198). There is no other evidence that any of the recipients actually received the letter.

### 2. Dr. Louis Shicker

Defendant Louis Shicker was the IDOC's Chief of Medical Services (also known as the Medical Director) from November 2009 through June 2016 (Doc. 286-2). His job responsibilities included overseeing all health-related services for the IDOC, monitoring contracted vendors, and updating policies and procedures. Although he was a trained physician, he did not directly participate in patient care in any of the prison settings.

Plaintiff sent Dr. Shicker a letter dated August 13, 2016 (which was before Plaintiff was transferred to Pinckneyville) and complained about the improper medical care he was receiving for his diabetes, HCV, mental health, vision, and pain near his left kidney (Doc. 265-1, p. 196; Doc. 183; Doc. 1-1, pg. 2–4). Plaintiff admitted that he has no proof that Dr. Shicker received this letter (Doc. 296, p. 15). The August 1, 2017 letter discussed above was also sent to Dr. Shicker (Doc. 1-1, pp. 71-82).[18] There is no evidence that Dr. Shicker ever received it. Notably, both letters

---

[18] Plaintiff also claims he sent a letter to Dr. Shicker on January 23, 2017 (Doc. 296, pp. 4, 15, 16). However, the document he cited to: Doc. 1-1, pp. 71–82, is the same document he cites to for the August 1, 2017 letter (*see* Doc. 296, pp. 3, 4, 7, 14, 15, 16). In other words, he claims the same letter was sent on two different dates. In looking at the

post-dated Dr. Shicker's tenure as Medical Director.

### 3. Dr. Steve Meeks

Defendant Steve Meeks was the IDOC Medical Director from November 1, 2016 through March 27, 2020 (Doc. 286-3). Plaintiff has never personally spoken to Dr. Meeks (Doc. 265-1, p. 210; Doc. 296, p. 18). Rather, the January 20, 2017 letter from Plaintiff's friend**,** Tanya Nguyen, was addressed to Dr. Meeks (Doc. 1-2, pg. 29). Dr. Meeks testified that he has no recollection or record of receiving any letter in January 2017 (Doc. 286-3). Plaintiff has no evidence that Dr. Meeks did, in fact, receive it (*see* Doc. 296).

On June 24, 2017, Plaintiff wrote a twenty-page letter to several individuals, including Dr. Meeks, regarding his dissatisfaction with the medical care he was receiving (Doc. 1-2, pp. 2–26; Doc. 265-1, p. 202). Dr. Meeks testified that he was never aware of the letter (Doc. 286-3). Plaintiff does not have any documentation or evidence that Dr. Meeks received this letter (*see* Doc. 296).

Plaintiff's friend**,** Tanya Nguyen, sent a letter on August 19, 2018 to Dr. Meeks and Pinckneyville Healthcare Unit Administrator Christine Brown regarding the lack of medical care for Plaintiff's HCV and pain near his left kidney (Doc. 1-2, p. 29; Doc. 286-12). Ms. Brown then wrote Dr. Meeks a memorandum dated September 7th, indicating that she had received a letter from Ms. Nguyen (Doc. 286-12; *see also* Doc. 286-3). Ms. Brown said she had Plaintiff sign a release so she could share his medical information with Ms. Nguyen (Doc. 286-12). Ms. Brown also summarized Plaintiff's medical issues and the healthcare he had been receiving (Doc. 286-12). Dr. Meeks testified that based on Ms. Brown's memo, he believed that "Plaintiff was receiving

---

letter, there is no date at the outset of it (*see* Doc. 1-1, pp. 71–74). However, a "certificate of service" following the letter indicates that it was sent out on August 1, 2017 (Doc. 1-1, p. 82). Consequently, the document at Doc. 1-1, pp. 71–82 is viewed as a letter sent out on August 1, 2017. And because there is no other evidence regarding a January 23, 2017 letter (*see* Doc. 296), Plaintiff's assertions to this effect are disregarded.

appropriate medical treatment and monitoring" (Doc. 286-3).

### 4.  Jacqueline Lashbrook

Defendant Jacqueline Lashbrook was the Warden at Pinckneyville from July 2015 through December 2016 (Doc. 286-4). Plaintiff's only interaction with Warden Lashbrook was on October 31, 2016, when Plaintiff was taken to the healthcare unit after a fight with his cell mate (Doc. 265-1, pp. 200–01; Doc. 296, p. 21). According to Plaintiff, he saw Lashbrook in the healthcare unit and told her and a nurse that he needed his eye glasses from his cell. Lashbrook said that she would "look into it." There is no mention of Plaintiff's glasses or interaction with Lashbrook in the medical record from this day (Doc. 265-2, p. 26; Doc. 265-3, pp. 98–101). Lashbrook testified via affidavit that, as warden, she would not have agreed to personally retrieve any items from a cell (Doc. 286-4).

### 5.  Karen Jaimet

Karen Jaimet replaced Jacqueline Lashbrook as the Warden at Pinckneyville in January 2017 (Doc. 286-5). She served as the Warden at Pinckneyville from January 2017 to June 2018. Prior to becoming Warden, she served as the Assistant Warden of Programs from October 2016 to January 2017.

On February 22, 2017, Warden Jaimet responded to a letter received from Plaintiff's friend, Megan Selby, regarding Plaintiff's health concerns (Doc. 1-2, p. 30). The response indicated the Warden was unable to communicate with Ms. Selby about Plaintiff's medical concerns without a signed release from Plaintiff, however, medical staff members were available and capable of addressing his medical concerns.

On June 14, 2017, Plaintiff filed an emergency grievance, regarding the inappropriate medical care he was receiving for his HCV and diabetes, his lost eyeglasses, and an incident where

Lieutenant Pierce refused to leave the examination room while Plaintiff attended a nurse sick call (Doc. 265-1, p. 203; Doc. 286-5; Doc. 286-13; Doc. 286-14, pp. 112-117). Warden's Jaimet's designee, Larue Love, deemed the grievance an emergency and it was processed on an expedited basis (Doc. 286-13). The grievance officer, Derek Flatt, consulted with Healthcare Unit Administrator Christine Brown, who reviewed and summarized the medical records, essentially verifying that Plaintiff was receiving regular medical attention for his problems. Based on Brown's response, Flatt recommended denying the grievance, which Warden Jaimet concurred with.

The June 24, 2017 and August 1, 2017 letters discussed above were also addressed to Warden Jaimet (Doc. 1-2, pp. 2–26; Doc. 1-1, pp. 71-82). Plaintiff admitted that he does not have any documentation or evidence that Warden Jaimet received the June letter (Doc. 296, p. 21). There is also no evidence that she ever received the August letter (*see* Doc. 286-5; Doc. 296).

Plaintiff also testified that "a few times while I was in seg" he requested to speak with Warden Jaimet "on numerous occasions" as she "was making her rounds" but she "basically brushed me off" (Doc. 265-1, pp. 202–03). He did not provide any further details about these purported conversations (*see id.*). However, the cumulative counseling summary indicates that Warden Jaimet saw Plaintiff in the segregation unit "during rounds" on August 21, 2017 (Doc. 286-15, p. 6). Plaintiff told her that "he has a virus and the HCU is not treating him" and she advised him that she would "check with the HCU" (*Id.*). Warden Jaimet testified that she has no independent recollection of Plaintiff or any specific conversations with him (Doc. 286-5).

### 6.  Larue Love

Defendant Larue Love was Assistant Warden of Programs at Pinckneyville when Plaintiff arrived there (Doc. 286-6). The following month (in October 2016), he became the Assistant Warden of Operations and served in that position through January 2020. (Doc. 286-6).

The June 24, 2017 letter from Plaintiff that is discussed above was addressed to Assistant Warden Love (Doc. 1-2, pp. 2–26; Doc. 265-1, p. 202). Plaintiff admitted that he does not have any documentation or evidence that Love received this letter (Doc. 296, p. 24). The August 1, 2017 letter discussed above was also addressed to Assistant Warden Love (Doc. 1-1, pp. 71-82). There is no evidence that he ever received it (*see* Doc. 296, Doc. 286-6). Aside from these letters, Plaintiff testified that he also spoke to Assistant Warden Love about his missing glasses (Doc. 265-1, p. 107). Plaintiff claims that Love told him there was no optometrist available and walked away. Defendant Love has admitted that he never recommended that Plaintiff see an optometrist outside Pinckneyville (Doc. 222, pg. 4).

### 7. Christine Brown

Defendant Christine Brown has been Healthcare Unit Administrator at Pinckneyville Correctional Center since 2014 (Doc. 286-7). Her job responsibilities are to direct, coordinate, and review activities of healthcare operations in conjunction with the Medical Director and the Nursing Director (*Id.*). She is a registered nurse, but she does not regularly treat patients in her current administrative role (*Id.*). The June 24, 2017 letter from Plaintiff that is discussed above was addressed to Ms. Brown (Doc. 1-2, pp. 2–26; Doc. 265-1, p. 202). Plaintiff admitted that he does not have any documentation or evidence that Brown received this letter (Doc. 296, p. 25). The August 19, 2018 letter discussed above was also addressed to Christine Brown (Doc. 286-12). As recounted above, Ms. Brown received the letter and then wrote a memorandum to Dr. Meeks indicating that Plaintiff was receiving appropriate medical treatment and monitoring. Ms. Brown also responded to inquiries pertaining to grievances that Plaintiff filed in December 2016, May 2017, and July 2017 (Doc. 265-3, pp. 100, 102, 103).

### 8.  Christopher Scott Thompson

Defendant Christopher Scott Thompson was the Clinical Services Supervisor at Pinckneyville from January 2017 to April 2017 (Doc. 286-10). He was then promoted to Assistant Warden of Programs after Karen Jaimet became Warden. He served in that position from April 2017 to June 2018. In June 2018, after Jaimet left her position as Warden, Thompson became the Acting Warden at Pinckneyville. He served in that position from June 2018 until February 2020.

It is undisputed that in February 2017, while Thompson was the Clinical Services Supervisor, he received a letter from Plaintiff's fried, Megan Selby (Doc. 227; Doc. 286-10). It is also undisputed that Thompson forwarded the letter to Plaintiff's counselor and the healthcare unit since it was "health related" (Doc. 227). He says he "expected the healthcare unit to appropriately address the medi[c]al concerns expressed in the correspondence" (*Id.*). Plaintiff, however, claims Thompson never followed-up with the healthcare unit to determine whether Plaintiff's medical concerns were addressed. (Doc. 296, pp. 11–12). However, it seems this is likely the same letter that Warden Jaimet responded to on February 22, 2017 (Doc. 1-2, p. 30).

Additionally, the June 24, 2017 letter that is discussed above was addressed to Thompson (Doc. 1-2, pp. 2–26; Doc. 265-1, pp. 199, 202, 204). Plaintiff, however, admitted he has no evidence that Thompson received this letter (Doc. 292, p. 30).

### 9.  Derek Flatt

Defendant Derek Flatt was a Grievance Officer at Pinckneyville from August 2014-February 2018 (Doc. 286-8). Plaintiff indicates that on June 18, 2017, he sent written correspondence to Defendant Flatt regarding missing grievances pertaining to his medical care—specifically, a non-emergency grievance dated November 17, 2016 that disappeared after he sent it to Flatt's "office" and a grievance dated May 7, 2017 that was responded to by his counselor on

May 18, 2017 (Doc. 296, p. 28; Doc. 1-1, p. 60; *see also id.* at pp. 9–18, 51–56). Plaintiff testified that Flatt never responded to his letter (Doc. 265-1, p. 208).

Plaintiff indicates that he sent another letter to Defendant Flatt on August 6, 2017, regarding missing grievances (Doc. 296, p. 28; Doc. 1-1, p. 61). That letter once again mentions the grievance dated May 7, 2017 regarding "medical treatment etc. etc." and two other grievances that were not related to medical care (Doc. 1-1, p. 61). Plaintiff testified that Flatt never responded to his letter (Doc. 265-1, p. 208).

Finally, as recounted above, Defendant Flatt reviewed and denied Plaintiff's June 14, 2017 emergency grievance. But Plaintiff argues that Flatt did not address the incident that occurred with Lieutenant Pierce (Doc. 296, p. 7; *see also* Doc. 286-13; Doc. 286-14, pp. 112-117).

**10. Rhonda McWilliams**

Defendant Rhonda McWilliams worked as a Correctional Counselor at Pinckneyville from April 2016 to February 2018 (Doc. 286-9). She was responsible for initial decisions on grievances submitted through the normal (non-emergency) process. According to Plaintiff, he submitted a grievance in November 2016 (Doc. 100-1, p. 1; Doc. 1-1, pp. 9–18). By mid-December, he had not received any kind of response, so he sent an Inmate Request asking about the status of the grievance (Doc. 100-1, p. 2; *see* also Doc. 109). Several days later, McWilliams made an announcement on the P.A. system advising inmates that she had recently been out on vacation and they should resubmit any grievances that were originally submitted while she was gone (Doc. 100-1, p. 2; Doc. 100-3, p. 2; Doc. 268-9). Plaintiff later spoke with McWilliams and tried to hand her a copy of the November grievance but she refused to take it and told him to put it in the grievance box (Doc. 265-1, pp. 205–07; *see also* Doc. 1-1, p. 23). By January, Plaintiff still had not received any kind of response to the grievance, so he once again inquired about it but McWilliams did not

respond to him (Doc. 100-1, p. 2; Doc. 100-3). McWilliams testified that she did not throw away grievances (Doc. 286-9), which Plaintiff does not dispute (Doc. 265-1, p. 206). She further testified that she did not ignore any of the grievances she received from Plaintiff (Doc. 286-9).

## DISCUSSION

Summary judgment is proper only if the movant shows that there is no genuine issue as to any material fact and they are entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). "Factual disputes are genuine only if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the evidence presented, and they are material only if their resolution might change the suit's outcome under the governing law." *Maniscalco v. Simon*, 712 F.3d 1139, 1143 (7th Cir. 2013) (citation and internal quotation marks omitted). In deciding a motion for summary judgment, the court must view the evidence in the light most favorable to, and draw all reasonable inferences in favor of, the nonmoving party. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 735 F.3d 962, 965 (7th Cir. 2013) (citation omitted).

The Eighth Amendment's proscription against cruel and unusual punishment imposes an obligation on states "to provide adequate medical care to incarcerated individuals." *Holloway v. Delaware Cty. Sheriff*, 700 F.3d 1063, 1072 (7th Cir. 2012) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). "Prison officials violate this proscription when they act with deliberate indifference to the serious medical needs of an inmate." *Holloway*, 700 F.3d at 1072 (citations omitted). To succeed on a claim for deliberate indifference, a plaintiff must demonstrate that they suffered from an "objectively, sufficiently serious" medical condition and that the defendant acted with a "sufficiently culpable state of mind." *Id.*

None of the Defendants argue that Plaintiff's medical conditions were not objectively serious (*see* Doc. 265, Doc. 286). Instead, they argue that they were not deliberately indifferent to

his medical conditions (*see* Doc. 265, Doc. 286). "A prison official is deliberately indifferent only if he 'knows of and disregards an excessive risk to inmate health or safety.'" *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). In other words, "[t]he defendant must know of facts from which he could infer that a substantial risk of serious harm exists, and he must actually draw the inference." *Whiting*, 839 F.3d at 662 (quoting *Farmer*, 511 U.S. at 837). This subjective standard "requires more than negligence or even gross negligence; a plaintiff must show that the defendant was essentially criminally reckless, that is, ignored a known risk." *Huber v. Anderson*, 909 F.3d 201, 208 (7th Cir. 2018) (quoting *Figgs v. Dawson*, 829 F.3d 895, 902 (7th Cir. 2016)).

## A.   TREATMENT PROVIDERS

For medical professionals, the deliberate indifference standard has been described as the "professional judgment" standard. *Sain v. Wood*, 512 F.3d 886, 894 (7th Cir. 2008). Treatment decisions are "presumptively valid" and entitled to deference so long as they are based on professional judgment—meaning they are fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm, and the efficacy of available treatments—and do not go against accepted professional standards. *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (citation omitted); *Rasho v. Elyea*, 856 F.3d 469, 476 (7th Cir. 2017); *Roe v. Elyea*, 631 F.3d 843, 859 (7th Cir. 2011). A medical professional may be held to have displayed deliberate indifference if the treatment decision was "blatantly inappropriate" even to a layperson, *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014); *see also Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016) (a jury can infer deliberate indifference when "a risk from a particular course of medical treatment (or lack thereof) is obvious."), or there is evidence that the treatment decision was "such a substantial departure from accepted professional

judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Petties*, 836 F.3d at 729; *see also Pyles*, 771 F.3d at 409 ("A medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances'") (citation omitted).

### 1. Nurse Practitioner Angel Rector

Plaintiff alleges that NP Rector was deliberately indifferent to his serious health needs when she ignored his requests for HCV treatment and vaccinations for Hepatitis A and B (*see* Doc. 183, p. 9; Doc. 282, pp. 4–8). However, the Court is convinced that no reasonable jury could find in Plaintiff's favor.

NP Rector saw Plaintiff on only one occasion on September 21, 2016. His APRI score was 0.71 and NP Rector did not take any further action or order any additional work-up. Plaintiff is adamant that NP Rector (as well as Dr. Scott and Dr. Butalid, who are both discussed in subsequent sections of this Order) failed to treat his HCV in accordance with the IDOC Guidelines (Doc. 282). He apparently believes that at the time he saw NP Rector, the 2014 Guidelines were still governing HCV treatment for IDOC inmates (*see* Doc. 282, p. 5). Under the 2014 Guidelines, if an inmate had an APRI score over 0.5, an additional work-up was supposed to be completed that included FibroSpect/Sure testing, vaccinations for Hepatitis A and B if the inmate was not already immune, HCV education and counseling, and a possible referral to UIC for evaluation for treatment (Doc. 282-3, p. 16). However, the evidence in the record plainly contradicts Plaintiff's assertion that the 2014 Guidelines were still in effect at the time he saw NP Rector.

Dr. Paul testified that the Guidelines were amended in June 2015 before Plaintiff was even incarcerated in the IDOC. Specifically, the IDOC had stopped using FibroSpect/Sure testing and the IDOC was instead conducting a liver-spleen ultrasound, but only if the patient's APRI was 1.0

or higher. In other words, by the time Plaintiff saw NP Rector, the threshold for ordering any additional work-up was an APRI score of 1.0. Plaintiff did not set forth any evidence that contradicted Dr. Paul's testimony (*see* Doc. 282). Furthermore, all of the practitioners who saw Plaintiff in 2016 and 2017, including NP Rector, Dr. Butalid, and Dr. Scott, were no longer following the May 2014 Guidelines; rather, they were all operating on the understanding that the threshold APRI score was above 1.0 (Docs. 265-8; Doc. 265-14; Doc. 282-4, pp. 71–72). Because Plaintiff's APRI score was under 1.0, the Guidelines did not require any additional work-up.

But even if the Court assumes Plaintiff is correct and the APRI cutoff for additional work-up was still 0.5 at the time he saw NP Rector, a purported failure to follow the IDOC's Guidelines does not automatically create liability for deliberate indifference. "[P]ublished requirements for healthcare do not create constitutional rights[.]" *Petties v. Carter*, 836 F.3d 722, 729 (7th Cir. 2016). Such protocols can, however, "provide circumstantial evidence that a prison healthcare gatekeeper knew of a substantial risk of serious harm," particularly when the protocol is well-established and widely known.[19]

Here, the protocol as to when to refer an HCV-positive inmate for additional work-up was ever-changing, as opposed to a well-established and widely recognized standard of care (*e.g.,* Doc. 282-3, pp. 2, 3, 15; Doc. 282-1, pp. 35, 92; Doc. 286-2, p. 1). Additionally, there is no evidence that an APRI score of 0.7 posed a serious risk of harm to Plaintiff. There is also no evidence that

---

[19] *Petties*, 836 F.3d at 729, 731–32 (finding it reasonable to infer treating physician knew that declining to immobilize Achilles tendon rupture would impede inmate's recovery where physician testified that immobilization was essential, as did two specialists, and Wexford's own protocol required it); *Mata v. Saiz*, 427 F.3d 745, 758 (10th Cir. 2005) (finding it reasonable to infer nurse knew severe chest pain posed a serious risk of harm when DOC protocols state that chest pains are a symptom of acute cardiac disease and two experts testified "it was an extremely well-known standard of care" that chest pain should be treated as an emergency until cardiac involvement is ruled out by a doctor). *See also Steele v. Choi*, 82 F.3d 175, 179 (7th Cir.1996) ("If the symptoms plainly called for a particular medical treatment—the leg is broken, so it must be set; the person is not breathing, so CPR must be administered—a doctor's deliberate decision not to furnish the treatment might be actionable under § 1983.").

the decision not to initiate further testing and possible treatment for an inmate with an APRI score over 0.5 but below 1.0 substantially deviated from accepted medical practices. Rather NP Rector, Dr. Butalid, and Dr. Scott all testified that when a patient's APRI score is below 1.5, monitoring the condition is an appropriate treatment plan (*see* Doc. 282-4, pp. 71–72; Doc. 265-8; Doc. 265-14). And expert witness Dr. Dina Paul also testified that the decision to monitor Plaintiff's HCV rather than refer him for additional work-up was in accordance with the IDOC's Guidelines and community standards of care (*see* Doc. 282-1, pp. 23, 26, 96). Plaintiff did not put forth any of his own expert evidence to the contrary (*see* Doc. 282). Consequently, there is nothing from which a reasonable jury could conclude that NP Rector acted with deliberate indifference to Plaintiff's HCV, and she is entitled to summary judgment.

### 2. Dr. Michael Scott

Dr. Michael Scott was the Medical Director at Pinckneyville for approximately the first six months that Plaintiff was incarcerated there. Plaintiff contends that Dr. Scott failed and/or refused to properly treat his HCV, diabetes, and the pain near his left kidney (Doc. 183, pp. 7; Doc. 282, pp. 6, 8–9, 10–11). However, the Court is convinced that no reasonable jury could find in Plaintiff's favor on his claims.

The evidence shows that Dr. Scott saw Plaintiff on three occasions between November 2016 and the end of January 2017. None of these appointments were scheduled for the purpose of addressing Plaintiff's HCV. Plaintiff contends that he nevertheless brought up his HCV and requested HCV treatment and vaccinations for Hepatitis A and B. But, according to Plaintiff, Dr. Scott refused to provide any treatment or order the "initial work up" outlined in the Guidelines. Even if what Plaintiff says is true, there is no basis for finding Dr. Scott liable for deliberate indifference. As discussed above, the evidence demonstrates that during the time Plaintiff was

under Dr. Scott's care, the threshold for initiating further testing and possible treatment for HCV under the IDOC's Guidelines was an APRI score of 1.0. There is no evidence Plaintiff's APRI score ever reached or exceeded 1.0. And as mentioned above, expert witness Dr. Dina Paul testified that the decision not to order any further work-up was in accordance with the IDOC's Guidelines and accepted medical practices, and Plaintiff did not put forth any evidence to the contrary. Consequently, Dr. Scott is entitled to summary judgment with regard to Plaintiff's HCV.

As for Plaintiff's diabetes, he argues Dr. Scott was deliberately indifferent because he ignored Plaintiff's request for a therapeutic diet, and without a therapeutic diet Plaintiff's diabetes remained uncontrolled (Doc. 282, pp. 8–10). This argument fails for a number of reasons. First, there is no definitive evidence that a therapeutic diet for diabetics was available at Pinckneyville. For his part, Plaintiff submitted a document titled "Illinois Department of Corrections Therapeutic Diet Manual," which he claims allowed Dr. Scott to order a diet geared specifically toward managing diabetes (Doc. 282, pp. 8–9). However, there is no evidence as to when, if ever, this Manual actually went into effect (*see id.*). According to Dr. Scott, there was no such thing as a special diet for diabetic inmates while he was the Medical Director at Pinckneyville. Rather, Dr. Scott testified that the regular meals were approved by a dietician and were appropriate for diabetic inmates. Dr. Butalid said the same, as did Healthcare Administrator Christine Brown. Plaintiff did not argue, let alone submit any evidence, that the regular meals offered at Pinckneyville were inappropriate for diabetic patients (*see* Doc. 282).

At any rate, even if the Court assumes that a therapeutic diet was available, Plaintiff is not entitled to dictate the treatment he is prescribed, nor is he entitled to receive every possible treatment available. *Arnett v. Webster*, 658 F.3d 742, 754 (7th Cir. 2011) ("[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible . . . ."); *Walker v.*

*Wexford Health Sources, Inc.*, 940 F.3d 954, 965 (7th Cir. 2019) ("[M]edical professionals may choose from a range of acceptable courses based on prevailing standards in the field.") (citation and internal quotation marks omitted). Courts "defer to medical professionals' treatment decisions unless there is evidence that no minimally competent professional would have so responded under those circumstances." *Walker*, 940 F.3d at 965 (citations and internal quotation marks omitted). Here, the medical records demonstrate that once Dr. Scott was made aware that Plaintiff's diabetes was not well-controlled, he prescribed medication, enrolled Plaintiff in the diabetes chronic clinic, educated Plaintiff on managing his diabetes, and continued to closely monitor Plaintiff, adjusting his medications as necessary. While Plaintiff claims that Dr. Scott should have also ordered a therapeutic diet, he has not put forth any evidence that it was essentially mandated by accepted professional standards. Nor was the decision not to order a therapeutic diet obviously wrong even to a layperson, particularly given the unchallenged evidence that the regular meals offered at Pinckneyville were appropriate for diabetic inmates. At most, Plaintiff's evidence shows that a therapeutic diet was another potential treatment option and perhaps it would have been beneficial. But Plaintiff's dissatisfaction with the prescribed course of treatment is insufficient to create a genuine question of material fact as to whether Dr. Scott was deliberately indifferent. *Pyles*, 771 F.3d at 409; *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006)

Finally, Plaintiff's argument that Dr. Scott's failure to prescribe a therapeutic diet is the reason that his diabetes remained uncontrolled strains credulity. The records demonstrate that at the same time Dr. Scott was repeatedly counseling Plaintiff on the importance of eating a well-balanced diet, Plaintiff was spending hundreds of dollars per month at the commissary on foods that diabetics are counseled to avoid, such as refined, highly processed carbohydrates and those with added sugar (like soda, juice, rice, noodles, chips, sugary cereal, cakes, cookies, and candy),

and saturated fats (like cheese, sausage, and other processed meats). For these reasons, no reasonable jury could find that Dr. Scott was deliberately indifferent to Plaintiff's diabetes and he is entitled to summary judgment in this regard.

That leaves Plaintiff's left flank pain. Plaintiff contends that Dr. Scott was deliberately indifferent because he did not order any additional testing or complete an additional examination to determine what was causing the pain (Doc. 282, p. 11). But the decision to forgo additional diagnostic tests is a "classic example of a matter for medical judgment." *Pyles v. Fahim*, 771 F.3d 403, 411 (7th Cir. 2014) (quoting *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Here, Plaintiff complained at his first appointment with Dr. Scott about pain near his left kidney that had been ongoing for several months. But he indicated that he was not in pain during the appointment and he had previously reported a pain level of only two out of ten. Dr. Scott examined Plaintiff and ran some tests, which ruled out any infection or problem with Plaintiff's kidneys. There is no indication that Plaintiff ever complained about the pain again during his three subsequent appointments with Dr. Scott. Given the circumstances—the unremarkable results from the diagnostic testing and Dr. Scott's own physical examination, the reportedly mild and intermittent nature of Plaintiff's pain, the lack of any other symptoms, and the absence of any further complaints of continuing or worsening pain—it can hardly be said that Dr. Scott's decision not to pursue additional diagnostic testing was blatantly inappropriate. Nor did Plaintiff put forth any evidence showing that it was a significant departure from accepted medical standards (*see* Doc. 282). Accordingly, no reasonable jury could find that Dr. Scott was deliberately indifferent to Plaintiff's left side pain and he is entitled to summary judgment in this regard.

### 3. Dr. Alberto Butalid

Plaintiff claims that Dr. Butalid failed and/or refused to properly treat his diabetes and

HCV (Doc. 183, pp. 9, 10; *see also* Doc. 282). However, the Court is convinced that no reasonable jury could find in Plaintiff's favor on his claims.

Plaintiff saw Dr. Butalid only once at an HCV chronic clinic visit in April 2017. His APRI score was 0.8, but as discussed above with respect to NP Rector, during the time Plaintiff was under Dr. Butalid's care, the threshold for initiating further testing and possible treatment for HCV under the IDOC's Guidelines was an APRI score of 1.0. Additionally, Plaintiff did not report any symptoms or complications with his HCV and none were apparent on examination. Dr. Butalid testified that based on his decades of experience as a medical doctor, he was of the opinion that he provided Plaintiff with appropriate care for his HCV (Doc. 265-14). Expert witness Dr. Dina Paul agreed (Doc. 282-1, pp. 23, 26, 96). Plaintiff did not put forth any of his own expert evidence to the contrary (*see* Doc. 282). Consequently, Plaintiff has failed to establish a material issue of fact with regard to Dr. Butalid's treatment of his HCV, and Dr. Butalid is entitled to summary judgment in that regard.

As for Plaintiff's diabetes, Plaintiff contends that he asked Dr. Butalid to order a therapeutic diet for him but Dr. Butalid ignored his request (Doc. 282, pp. 9–10). However, as explained above with respect to Dr. Scott, the failure to order a therapeutic diet was not obviously wrong or blatantly inappropriate even to a layperson, nor did Plaintiff put forth any evidence that it was a substantial deviation from accepted professional practices. Consequently, no reasonable jury could find that Dr. Butalid was deliberately indifferent to Plaintiff's diabetes, and Dr. Butalid is entitled to summary judgment in that regard.

### 4. Dr. Nageswararao Vallabhaneni

Plaintiff alleges that Dr. Vallabhaneni was deliberately indifferent to his serious health needs when the doctor discontinued his anti-psychotic medication, Risperdal, in September 2016

(Doc. 183, p. 7; Doc. 282, pp 11–14). However, the Court is once again convinced that no reasonable jury could find in Plaintiff's favor.

Dr. Vallabhaneni testified via affidavit that based on his evaluation of Plaintiff and his "decades of experience as a psychiatrist," he was of the opinion that the anti-psychotic medication was not medically necessary for Plaintiff (Doc. 261-11). Plaintiff was "on board with" and consented to the discontinuation of his medication (Doc. 265-1, p. 160; Doc. 283-1, pp. 39, 42). Plaintiff did not set forth any expert testimony that Dr. Vallabhaneni's chosen course of treatment was a substantial departure from accepted medical judgment (*see* Doc. 282), and the decision was not so obviously wrong that a layperson could draw the required inference about the doctor's state of mind without expert testimony. Consequently, there is nothing from which a reasonable jury could find that Dr. Vallabhaneni was deliberately indifferent and his motion for summary judgment is granted.

### 5. Rose Loos

Plaintiff alleges that Ms. Loos was deliberately indifferent with respect to his mental health and HCV (Doc.   183, p. 7; Doc. 282, pp. 6–7, 12–14). Specifically, Plaintiff claims that he told Ms. Loos that he was receiving inappropriate care for his HCV and she assured him that she would look into the issue but she never referred him to the healthcare unit for an evaluation (Doc. 282, pp. 6–7; Doc. 265-1, pp. 164-65). The evidence shows that Plaintiff complained to Ms. Loos on January 10, 2017 that he was not feeling well and thought it was related to his diabetes or HCV. Ms. Loos was not a medical provider and could not diagnose or prescribe any treatments for HCV. Nor did she have any control over the medical providers and their treatment decisions. The most she could do was refer Plaintiff's complaint to the healthcare unit. But Plaintiff was already scheduled to see Dr. Scott the very next day and at that appointment, he was enrolled in the diabetes

chronic care clinic. And he was already enrolled in the HCV chronic care clinic and was being evaluated and monitored every six months. In other words, Ms. Loos knew that Plaintiff was actively seeing medical professionals for his medical conditions and she was entitled to rely on them to provide proper treatment. *Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019), *cert. denied,* 140 S. Ct. 50 (2019). ("If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."); *Burks v. Raemisch*, 555 F.3d 592, 596 (7th Cir. 2009) ("A layperson's failure to tell the medical staff how to do its job cannot be called deliberate indifference; it is just a form of failing to supply a gratuitous rescue service.") Furthermore, the Court has already concluded that Plaintiff failed to show any of the medical providers were deliberately indifferent in treating his diabetes or HCV, and therefore he cannot show that Ms. Loos violated his Eighth Amendment rights by failing to intervene in their care. *Thomas v. Wahl*, 590 Fed. Appx. 621, 624 (7th Cir. 2014) (holding because plaintiff failed to show any medical personnel were deliberately indifferent, prison administrators could not be held liable for failing to investigate his complaints of inadequate medical care); *Reed v. Indiana Dep't of Corr.*, 30 Fed. Appx. 616, 619 (7th Cir. 2002) (same).

As for Plaintiff's mental health, he claims that Ms. Loos "carelessly mismanaged [his] psychiatric care" (Doc. 282, p. 14). Specifically, Plaintiff told Ms. Loos at an appointment on December 8, 2016, that he wanted to restart his medications, and it is undisputed that she referred him to the psychiatrist (Doc. 282, pp. 12–14). However, Plaintiff still had not seen the psychiatrist by the time he saw Ms. Loos again in January 2017, or even by the time he saw her in April, May, and June 2017. He finally saw the psychiatrist on July 13, 2017. Plaintiff claims Ms. Loos was deliberately indifferent when she failed to follow-up on her referral or to make additional referrals to the psychiatrist (Doc. 282, pp. 12–14). He argues that "[a]s a result of Loos' complete disregard

for [his] psychiatric conditions, [he] went approximately seven months without seeing the psychiatrist while experiencing irritability and aggression." (*Id.* at p. 14).

This argument is unpersuasive. There is no evidence that duplicate referrals to the psychiatrist would have hastened an appointment. In fact, other mental health providers did make additional referrals in May and June 2017, all to no effect. There is also no evidence, or even a suggestion, that Ms. Loos could have taken some other action aside from re-referring Plaintiff. Simply put, the Court acknowledges that there was a long delay in getting Plaintiff in to see a psychiatrist, but there is a complete dearth of evidence that Ms. Loos had the power or the ability to do anything about it.[20] Consequently, no reasonable jury could find that she was deliberately indifferent to Plaintiff's mental health and she is entitled to summary judgment.

### 6. Wexford Health Sources, Inc.

A private corporation acting under the color of state law, like Wexford, can be held liable under § 1983 for constitutional violations based on the *Monell* theory of municipal liability. *Glisson v. Indiana Dep't of Corr.*, 849 F.3d 372, 378–79 (7th Cir. 2017) (*en banc*). Under *Monell*, a plaintiff must show that his constitutional injury was caused by the corporation's own actions. *Pyles v. Fahim*, 771 F.3d 403, 409–10 (7th Cir. 2014) (quoting *Minix v. Canarecci,* 597 F.3d 824, 832 (7th Cir.2010)). A corporate action can take the form of an express policy adopted and promulgated by the corporation, an informal but widespread and well-settled practice or custom, or a decision by an official of the corporation with final policymaking authority. *Glisson*, 849 F.3d at 379.

Here, the nature of Plaintiff's argument against Wexford is not entirely clear to the Court. He states:

---

[20] There is no suggestion that Wexford should be held responsible for this delay (*see* Doc. 292).

It is widely known and accepted that Wexford has failed to provide the IDOC and inmates within the IDOC quality medical care. The evidence uncovered in this matter establishes that Wexford and its employees have a policy, custom and practice of disregarding IDOC policies and guidelines. As discussed extensively above, Wexford and its employees failed to provide Plaintiff with medical care that meets the standard of practice and complies with IDOC Guidelines. There is more than sufficient evidence to establish a series of constitutional violations committed by Wexford.

(Doc. 282, p. 15). He further asserts that Wexford was aware of the deficiencies in the care he was receiving because he sent them letters about it (*Id.* at pp. 15, 16).

On the one hand, it seems like Plaintiff is arguing that Wexford is vicariously liable for the misdeeds of its employees. To the extent that is true, this argument is dead on arrival. Under controlling precedent, a private corporation, like Wexford, cannot be held vicariously liable in litigation under § 1983. *E.g.*, *Gaston v. Ghosh*, 920 F.3d 493, 494 (7th Cir. 2019).

On the other hand, it seems like Plaintiff is arguing that the purportedly inadequate medical care he received was in accordance with Wexford's widespread practice or custom of providing constitutionally subpar medical care or its practice and custom of condoning or turning a blind eye to deficient medical care. However, the Court has already concluded that Plaintiff failed to show an issue of fact as to whether any of the Defendant medical providers were individually liable for deliberate indifference or provided him with constitutionally inadequate care. Therefore, he did not suffer an actionable injury from the widespread practice he attributes to Wexford. *See, e.g., Pyles v. Fahim*, 771 F.3d 403, 412 (7th Cir. 2014); *Ray v. Wexford Health Sources, Inc.*, 706 F.3d 864, 866 (7th Cir. 2013).

Moreover, Plaintiff has failed to marshal sufficient evidence from which a reasonable jury could conclude that the medical providers' treatment decisions were made pursuant to the alleged widespread practice. His only admissible evidence pertains to the purported deficiencies specific to his own experience. He did not, for example, provide any admissible evidence of other inmates

who were harmed by the alleged systemic failings or testimony from prison officials regarding the existence of the alleged systemic failings (*see* Doc. 282; *see also* Doc. 306). *Cf. Davis v. Carter*, 452 F.3d 686, 695 (7th Cir. 2006). Consequently, no reasonable juror could conclude that there was a true corporate policy at issue, as opposed to a random event. *Grieveson v. Anderson*, 538 F.3d 763, 774 (7th Cir. 2008).

For these reasons, Wexford is entitled to summary judgment.

## B.   GRIEVANCE OFFICIALS

For the following Defendants, Plaintiff claims that he complained to them in some form or fashion (*e.g.*, written correspondence, grievance, face-to-face) regarding the purportedly inadequate medical care that he was receiving, but the Defendants ignored his complaints and failed to take any corrective action (Doc. 183; Doc. 282; Doc. 296).

When it comes to non-medical officials, the Seventh Circuit has "long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019), *cert. denied,* 140 S. Ct. 50 (2019). "If a prisoner is under the care of medical experts . . . a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Id.* (quoting *Greeno v. Daley*, 414 F.3d 645, 656 (7th Cir. 2005)). However, non-medical officials can be held liable for deliberate indifference if they have "a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Giles*, 914 F.3d at 1050 (quoting *Spruill v. Gillis*, 372 F.3d 218, 236 (3d Cir. 2004)). An inmate's correspondence to a prison official may thus establish a basis for personal liability under § 1983 where that correspondence, "in its content and manner of transmission" gave the official sufficient notice that the prisoner's serious medical condition was not being treated by

prison medical providers, yet the official took no action to assist in obtaining care for the prisoner. *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (citation omitted); *accord Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015).

As for medical administrators like Defendants Dr. Shicker, Dr. Meeks, and Healthcare Unit Administrator Christine Brown, who are not directly responsible for providing medical care, they can be held liable as supervisors if they know of and facilitate, approve, condone, or turn a blind eye to medical personnel providing inadequate treatment. *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017).

### 1.  John Baldwin

Plaintiff claims, his friend, Tanya Nguyen, sent Director Baldwin a letter on January 20, 2017 and he sent Director Baldwin a second letter on August 1, 2017, regarding the inadequate treatment he was receiving for his HCV, diabetes, vision issues, and the pain he had in his left side near his kidney. There is no evidence, however, that Director Baldwin ever received either letter or otherwise knew about Plaintiff's issues with his healthcare. There is also no evidence Baldwin was in any way involved in decisions made regarding Plaintiff's healthcare. And Baldwin cannot be held liable solely because he was in charge. *E.g., Lennon v. City of Carmel, Indiana*, 865 F.3d 503, 507–08 (7th Cir. 2017) ("[T]here is no vicarious liability in a suit under section 1983."). Finally, and perhaps most importantly, the Court has already concluded that Plaintiff failed to show any of the medical providers were deliberately indifferent in treating his diabetes, HCV, or side pain, and consequently, there was no impermissible conduct for Director Baldwin to turn a blind eye to and he cannot be held liable for deliberate indifference for failing to intervene in Plaintiff's care. *Thomas v. Wahl*, 590 Fed. Appx. 621, 624 (7th Cir. 2014); *Reed v. Indiana Dep't of Corr.*, 30 Fed. Appx. 616, 619 (7th Cir. 2002). For these reasons, there is no basis for holding Director

Baldwin liable, and he is entitled to summary judgment.

### 2. Dr. Louis Shicker

Plaintiff claims he wrote Dr. Shicker a letter in August 2016 and another in 2017 complaining about his medical care, but Dr. Shicker ignored the letters (Doc. 183; Doc. 265-1, p. 199; Doc. 296, pp. 3–4). Plaintiff admitted, however, that he has no proof that Dr. Shicker received the August 2016 letter, and there is no competent evidence that Dr. Shicker received the 2017 letter (*see* Doc. 306). More importantly, however, Dr. Shicker was no longer the IDOC medical director by the time either letter was sent. So even if he happened to receive them, he did not have the authority to take any action or direct any treatment be provided to Plaintiff. Consequently, there is no basis for holding Dr. Shicker liable, and he is entitled to summary judgment.

### 3. Dr. Steve Meeks

Plaintiff claims his friend sent Dr. Meeks a letter in January 2017, he wrote Dr. Meeks a letter in June 2017, and his friend wrote a second letter to Dr. Meeks in August 2018. All the letters pertained to the purportedly inadequate medical care he was receiving for his diabetes, HCV, vision issues, and pain in his left side near his left kidney. But Dr. Meeks ignored the letters (Doc. 183; Doc. 296, pp. 4–5). The Court has already concluded that Plaintiff failed to show any of the medical providers were deliberately indifferent in treating his diabetes, HCV, or side pain, and consequently, there was no impermissible conduct for Dr. Meeks to approve of, facilitate, or condone with respect to these conditions. Dr. Meeks therefore cannot be held liable for deliberate indifference for not intervening in Plaintiff's care.

Plaintiff's vision issues were mentioned in the January 2017 letter and the June 2017 letter (Doc. 1-2, pg. 29; Doc. 1-2, pp. 2–26). However, Dr. Meeks testified that he has no recollection or record of receiving these letters (Doc. 286-3), and Plaintiff did not offer any evidence to the

contrary (*see* Doc. 296). While it is undisputed that Dr. Meeks received notice of the third letter sent in August 2018, it does not appear that Plaintiff's vision issues were mentioned in this letter (*see* Doc. 286-12).[21] Consequently, there is no evidence that Dr. Meeks was ever made aware of any issues regarding Plaintiff's vision. Furthermore, Plaintiff did not point to any evidence regarding the extent of his visual impairment without glasses or make any argument that his need for glasses constituted a serious medical need (*see* Doc. 296, pp. 5–6, 20–21).[22] No reasonable jury could therefore conclude that Dr. Meeks "kn[e]w of and disregard[ed] an excessive risk to inmate health or safety." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Dr. Meeks is entitled to summary judgment with respect to Plaintiff's vision issues.

### 4. Jacqueline Lashbrook

Plaintiff alleges that Warden Lashbrook was deliberately indifferent to his missing glasses (Doc. 296, pp. 5–6). He claims he saw Lashbrook in the healthcare unit on October 31, 2016 and told her that he needed his glasses and she said she would "look into it." Even if things went exactly as Plaintiff claims, it is not enough to hold Lashbrook liable for deliberate indifference. Plaintiff did not point to any evidence regarding the extent of his visual impairment without glasses or make any argument that his need for glasses constituted a serious medical need, nor did he present any

---

[21] The letter itself does not appear to be part of the record. The parties cited only to the memo Christine Brown sent to Dr. Meeks after she received the letter (*see, e.g.,* Doc. 296, pp. 17, 19).

[22] Hundreds and hundreds of pages of records regarding Plaintiff's medical treatment and his grievances/correspondence to prison officials have been submitted to the Court (Docs. 1-1, 1-2, 94-1, 94-2, 94-3, 265-2, 265-3, 265-6, 265-7, 286-14). The Court thus suspects there is information in the record about the severity of Plaintiff's visual impairment without glasses, but Plaintiff did not point it out. And the Court will not sift through the voluminous records for the relevant information and make Plaintiff's argument for him. *See* FED. R. CIV. P. 56(c)(3) ("The court need consider only the cited materials . . . ."); *Sommerfield v. City of Chicago*, 863 F.3d 645, 650 (7th Cir. 2017) (approving of district judge's refusal "to wade through the voluminous record to find evidence on a counseled plaintiff's behalf.")

evidence or argument that Lashbrook was aware of the severity of his vision problems (*see* Doc. 296, pp. 5–6, 20–21). Consequently, no reasonable jury could conclude that Lashbrook "kn[e]w of and disregard[ed] an excessive risk to inmate health or safety." *Whiting,* 839 F.3d at 662 (citation omitted). Warden Lashbrook is thus entitled to summary judgment.

### 5. Karen Jaimet

Plaintiff alleges that Warden Jaimet was deliberately indifferent to his missing glasses and the medical care he was receiving for his HCV, diabetes, and pain in his left side (Doc. 296, pp. 6–7). However, the Court has already concluded that Plaintiff failed to show any of the medical providers were deliberately indifferent in treating his diabetes, HCV, or side pain, and consequently, there was no impermissible conduct for Warden Jaimet to turn a blind eye to. She therefore cannot be held liable for deliberate indifference for failing to intervene in Plaintiff's care. Jaimet also cannot be found deliberately indifferent with respect to Plaintiff's eyeglasses because, as already explained, there is no evidence regarding the extent of his visual impairment without glasses or that Jaimet was aware of the severity of his vision problems (*see* Doc. 296).

### 6. Larue Love

Plaintiff alleges that Assistant Warden Love was deliberately indifferent to his missing glasses because after he told Love about his missing glasses, Love simply said there was no optometrist available and walked away (Doc. 296, p. 8). Even if that is true, Assistant Warden Love cannot be held liable because, as previously mentioned, there is no evidence regarding the extent of Plaintiff's visual impairment without glasses or that Love was aware of the severity of his vision problems (*see* Doc. 296).

Plaintiff also alleges that Assistant Warden Love was deliberately indifferent regarding his inability to obtain medical care for his HCV, diabetes, and pain in the left kidney area (Doc. 296,

p. 8). Specifically, Plaintiff claims he sent letters to Love in June 2017 and August 2017. However, there is no evidence that Love received either letter or knew about Plaintiff's issues with his healthcare. Additionally, the Court has already concluded that Plaintiff failed to establish an issue of fact that any of the medical providers were deliberately indifferent in treating his diabetes, HCV, or side pain, and therefore Plaintiff cannot show that Love violated his Eighth Amendment rights by failing to address his complaints about their care. For these reasons, Defendant Love is entitled to summary judgment.

### 7.   Christine Brown

Plaintiff contends that Healthcare Unit Administrator Christine Brown was deliberately indifferent to his missing glasses and the medical care he was receiving for his HCV, diabetes, and pain in his left side (Doc. 296, pp. 8–9). Specifically, he claims Ms. Brown gave false and misleading information about his medical care when she responded to inquiries pertaining to his grievances. He also claims that she failed to respond to the letter he sent her in June 2017. The Court has already concluded that Plaintiff failed to show any of the medical providers were deliberately indifferent in treating his medical conditions, and therefore he cannot show that Ms. Brown violated his Eighth Amendment rights by approving of or failing to intervene in their care. Ms. Brown is entitled to summary judgment.

### 8.   Christopher Scott Thompson

Plaintiff claims that Thompson "was aware of [his] medical complaints and took no action to address them" (Doc. 296, pp. 10–11). It is undisputed that when Defendant Thompson was the Clinical Services Supervisor, he received a February 2017 letter from Plaintiff's friend, Megan Selby, and forwarded the letter to the healthcare unit. Plaintiff argues that Thompson is nevertheless liable for deliberate indifference because he never followed-up with the healthcare

unit to determine whether his medical concerns had been addressed (Doc. 296, p. 10).[23] Plaintiff further claims that he sent Defendant Thompson a letter about his medical issues in June 2017 when Thompson was the Assistant Warden of Programs. Plaintiff, however, admits that he has no proof Thompson received the letter. The Court has already concluded that Plaintiff failed to show any of the medical providers were deliberately indifferent in treating his diabetes, HCV, or side pain, and consequently, there was no impermissible conduct for Thompson to turn a blind eye to and he cannot be held liable for deliberate indifference for failing to intervene in Plaintiff's care. Thompson also cannot be found deliberately indifferent with respect to Plaintiff's eyeglasses because, as already explained, there is no evidence regarding the extent of his visual impairment without glasses or that Thompson was aware of the severity of his vision problems (*see* Doc. 296).

### 9. Derek Flatt

Plaintiff claims that grievance officer Flatt "was aware of [his] medical complaints and took no action to address them" (Doc. 296, pp. 9–10). Specifically, Plaintiff says he sent letters to Flatt in June 2017 and August 2017 regarding missing grievances pertaining to medical care but Flatt never responded. However, neither of these letters contain any information about his purported medical issues (*see* Doc. 1-1, pp. 60, 61). There is also no evidence that Flatt ever received these letters or that he saw the purportedly missing grievances or was responsible for processing them. Flatt did, however, review and recommend denying Plaintiff's June 14, 2017 emergency grievance. In doing so, he consulted with Healthcare Unit Administrator Christine Brown to ensure that Plaintiff's complaints did not require further action. Flatt did not have to do

---

[23] Plaintiff also states that Thompson never informed him that he had received the letter from Ms. Selby (Doc. 296, 10). Plaintiff does not, however, explain or cite to any authority as to how this purported failure could have possibly violated his constitutional rights (*see id.*). As far as the Court knows, this purported failure is of no constitutional significance whatsoever.

anything more and he was entitled to rely on Ms. Brown's professional judgment regarding Plaintiff's medical care because there was nothing in her report that made it obvious Plaintiff might not be receiving adequate care. *Giles v. Godinez*, 914 F.3d 1040, 1050 (7th Cir. 2019); *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008). Furthermore, as with the other grievance officials, Flatt cannot be held liable for failing to intervene in Plaintiff's medical care because the Court has already concluded that Plaintiff failed to establish any of the medical providers were deliberately indifferent in treating him. For these reasons, Defendant Flatt is entitled to summary judgment.

### 10. Rhonda McWilliams

Plaintiff claims that counselor McWilliams "was aware of [his] medical complaints and took no action to address them" (Doc. 296, p. 10). Specifically, he claims McWilliams refused to accept a grievance and failed to respond to his inquiries about the grievance (*Id.*). To the extent Plaintiff is claiming that Ms. McWilliams is liable because she mishandled his grievances, this claim must fail. *Owens v. Hinsley*, 635 F.3d 950, 953 (7th Cir. 2011) ("[T]he alleged mishandling of . . . grievances by persons who otherwise did not cause or participate in the underlying conduct states no claim."). To the extent Plaintiff is claiming that Ms. McWilliams was aware of his medical complaints but took no action to address them (Doc. 296, p. 10), this claim must also fail. There is no evidence that Ms. McWilliams ever received or reviewed the November 2017 grievance that purportedly went missing. There is also no evidence that Ms. McWilliams received Plaintiff's follow-up inquiries, but additionally, neither of those inquiries contain any information about his purported medical issues (*see* Doc. 100-2; Doc. 100-3). Consequently, no reasonable jury could conclude that she had sufficient notice of a constitutional deprivation but declined to take any action to rectify it. Furthermore, as with the other grievance officials, McWilliams cannot be held liable for failing to intervene in Plaintiff's medical care because the Court has already

concluded that Plaintiff failed to establish any of the medical providers were deliberately indifferent in treating him. For these reasons, Defendant McWilliams is entitled to summary judgment.

<u>CONCLUSION</u>

The motions for summary judgment filed by the Wexford Defendants (Doc. 264) and the IDOC Defendants (Doc. 285) are **GRANTED**. Summary judgment is **GRANTED** as to Dr. Alberto Butalid, Rose Loos, Angel Rector, Dr. Michael Scott, Dr. Nageswararao Vallabhaneni, Wexford Health Sources, Inc., John Baldwin, Christine Brown, Derek Flatt, Karen Jaimet, Jacqueline Lashbrook, Larue Love, Rhonda McWilliams, Dr. Steve Meeks, Dr. Louis Shicker, and Christopher Scott Thompson. Plaintiff's claims against these Defendants are **DISMISSED** with prejudice and the Clerk of Court is **DIRECTED** to enter judgment in their favor and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: November 30, 2020**

**s/ Mark A. Beatty**
**MARK A. BEATTY**
**United States Magistrate Judge**